J-S78020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRELL ANTWON | : | |
| | : | |
| Appellant | : | No. 3069 EDA 2017 |

Appeal from the Judgment of Sentence Entered May 19, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0007696-2015

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED APRIL 04, 2019**

Terrell Antwon appeals the judgment of sentence entered on May 19, 2017, after the jury convicted him of third-degree murder; carrying a firearm on a public street or public property in Philadelphia; and possessing an instrument of crime.[1] Antwon challenges the sufficiency and weight of the evidence; maintains that the trial court erred in denying his motion to suppress; and that the Commonwealth failed to disprove his claim of self-defense and defense of others. We affirm.

The trial court aptly summarized the facts of this case as follows:

At trial, the Commonwealth presented the testimony of Philadelphia Police Officers Kenneth Downing, Brian Stark, Steven Berardi, Kelly Walker, and Michael Levin, Philadelphia Police Detectives John Keen and James Pitts, [and] Philadelphia Police

---

*   Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c), 6108, and 907, respectively.

Sergeants William Robbins Harvey, Steven Guy, Lonay Newkirk, and Debra Morgan. Co-defendant Wiggins presented the testimony of Kimberlee Johnson, Dorin Harris, and Lorraine Stewart. [Antwon] did not present any evidence. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On November 23, 2012, at approximately 1:30 a.m., Rashon Wiggins was engaged in an argument with Anthony Palmer outside of Buffy's bar at the corner of Clarissa Street and Dennie Street in Philadelphia. The victim, Johnika Tiggett, walked up to Wiggins and Palmer and attempted to get them to stop arguing. [Antwon] then came up and whispered something to Wiggins, who then walked away. After Wiggins walked away, [Antwon] and Palmer began arguing. Tiggett, again, attempted to stop the argument, and then left, heading down Dennie Street toward Wayne Avenue. Palmer and Wiggins, however, continued arguing until Palmer started walking away to the other side of Dennie Street, where Byron McDonald, Roland Thompson ("Mustafa"), and Roland Thompson, Jr. ("Man-Man") were standing. [Antwon] then pulled out a semiautomatic handgun and began shooting in Palmer's direction. McDonald, Mustafa, Man-Man, and Palmer then began shooting back at defendant. During the shootout, during which around 40 shots were fired, Mustafa fired a shot that struck Tiggett in the back of the neck while she was running away down the street. Police took Tiggett to Temple Hospital, where she died later than night. An autopsy later revealed the cause of death was a gunshot wound to the neck.

Trial Court Pa.R.A.P. 1925(a) Opinion ("TCO"), filed November 22, 2017, at 2-3 (citations to notes of testimony omitted). Following trial, the trial court sentenced him to life without parole for third-degree murder and no further penalty for the remaining charges. Antwon filed a post-sentence motion, which the trial court denied. This timely appeal followed.

Antwon raises the following issues on appeal:

1. Whether the out-of-court identification procedures violated [Antwon's] Due Process rights where an unduly suggestive

single photograph was presented to two witnesses to identify [Antwon] instead of a multiple photograph array?

2. Whether the evidence produced at trial was sufficient to sustain the jury's verdict that [Antwon] had the requisite malicious intent necessary to convict him of Murder of the Third Degree?

3. Whether the jury's verdict finding [Antwon] guilty of Murder of the Third Degree was against the weight of the evidence?

4. Whether the Commonwealth failed to disprove self-defense and defense of others beyond a reasonable doubt where [Antwon] fired at four men who were firing at him and others?

Antwon's Br. at 5-6.

DENIAL OF SUPPRESSION MOTION

Our review of the denial of a suppression motion is as follows:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [] plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (brackets in original) (quoting *Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa.Super. 2015)). We are also limited to reviewing the evidence from

- 3 -

suppression hearing. *Id.* Antwon argues that the trial court erred in denying his motion to suppress out of court identifications from two witnesses, Steven Guy and Lonay Newkirk.

"[W]here a defendant does not show improper police conduct resulted in a suggestive identification, suppression is not warranted." ***Commonwealth v. Sanders***, 42 A.3d 325, 330 (Pa.Super. 2012). The Commonwealth bears the burden of establishing "that the totality of the circumstances affecting the witness' identification did not involve a substantial likelihood of misidentification." ***Commonwealth v. Jones***, 426 A.2d 1167, 1170 (Pa.Super. 1981).

Here, Antwon maintains that because both witnesses were shown a single photograph of him, he was "subjected to a tainted, unduly suggestive, improper pretrial identification procedure." Antwon's Br. at 17. He cites no legal authority that would support his argument. However, this Court in ***Jones*** found suppression unwarranted in a nearly identical factual scenario. ***Jones*** involved a gas station robbery. During the robbery, Jones threatened two of the employees. One of those employees was shown a single photograph to identify Jones as the assailant. On appeal, Jones argued that showing the witness a single photograph to identify him as the suspect was improper and therefore the identification should have been suppressed. We disagreed, concluding that where the witness knew Jones prior to the crime; viewed Jones at close range during the robbery; and identified him by name prior to being

shown the photograph, showing a single photograph was not improper. *Id.* at 1170-71.

Similar to *Jones*, in the instant case both witnesses viewed Antwon during the shooting and knew him prior to the shooting. Mr. Guy knew Antwon for approximately two years prior to the shooting, and while he did not know Antwon by name, he knew that he drove a white Buick LeSabre, had been in and out of jail, and observed him shooting on the day of the incident. N.T., Suppression Hearing, October 14, 2016, at 24, 26. Ms. Newkirk knew Antwon for five years, knew him by the name of "Rell," and observed him shooting on the day of the incident. *Id.* at 31-32. Showing these witnesses a single photograph of Antwon was not unduly suggestive and "there was no basis in law to suppress either the out-of-court or in-court identifications of [Antwon]." TCO at 5. No relief is due. *See Jones*, 426 A.2d at 1171.

SUFFICIENCY AND WEIGHT OF THE EVIDENCE

Our standard of review for a claim challenging the sufficiency of the evidence is *de novo* and our scope of review is plenary. *See Commonwealth v. Neysmith*, 192 A.3d 184, 189 (Pa.Super. 2018). We view the facts in the light most favorable to the verdict winner, "giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Id.* (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000)).

Antwon maintains that the evidence was insufficient to establish malice for third-degree murder. He argues that "the trial testimony clearly demonstrated, [he] was the only person trying to stop the argument from

escalating." Antwon's Br. at 21. Malice "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (quoting *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)).

It is uncontested that Antwon did not shoot the fatal shot that took the victim's life. However, viewing the facts in the light most favorable to the Commonwealth, "[t]he evidence . . . established that [Antwon] voluntarily and with malicious intent engaged in a shootout outside of Buffy's and that, as a result of that shootout, the victim was shot in the neck, which caused the victim's death." TCO at 8. While Antwon argues that the evidence shows that he was trying to deescalate the argument, the testimony was clear that he was the first to pull "out a semiautomatic handgun and fire approximately 15 shots at Palmer" and in return Palmer and three of his friends fired in Antwon's direction which resulted in the victim being shot in the back. *Id.* at 7-8; *see also* N.T., Trial, May 16, 2017, at 110-11; 117-19; 120-22. The evidence was sufficient to prove that Antwon's actions were malicious even though he may not have intended harm towards the victim. *See Packer*, 168 A.3d at 168; *see also Commonwealth v. Gaynor*, 648 A.2d 295, 299 (Pa. 1994) (concluding death of victims could be attributed to defendant based on transferred intent even though his bullets did not murder or wound the

victims).[2] Similarly, the above evidence rebuts Antwon's argument that the verdicts were against the weight of the evidence.

We review a weight claim for an abuse of discretion. ***Commonwealth v. Windslowe***, 158 A.3d 698, 712 (Pa.Super. 2017). "[A] defendant must prove the evidence is 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" ***Id.*** (quoting ***Commonwealth v. Mucci***, 143 A.3d 399, 411 (Pa.Super. 2016)).

Here, the evidence was consistent that Antwon began the shootout and that it resulted in the victim being shot in her back. We find no abuse of discretion by the trial court in concluding that the evidence was not "so tenuous, vague and uncertain" as to shock the conscience of the court. ***Windslowe***, 158 A.3d at 712.

SELF-DEFENSE/DEFENSE OF OTHERS

Last, Antwon maintains that "the Commonwealth failed to disprove that [he] acted in self-defense or defense of others." Antwon's Br. at 20. A defendant bears "no burden to prove self-defense." ***Commonwealth v. Mouzon***, 53 A.3d 738, 740 (Pa. 2012). Rather, the Commonwealth bears the burden to disprove the defendant's claim of self-defense or defense of others beyond a reasonable doubt. ***See Commonwealth v. Hornberger***, 74 A.3d

---

[2] "The transferred intent theory provides that if the intent to commit a crime exists, this intent can be transferred for the purpose of finding the intent element of another crime." ***Commonwealth v. Thompson***, 739 A.2d 1023, 1029-30 (Pa. 1999) (quoting ***Commonwealth v. Gibbs***, 626 A.2d 133, 138 (Pa. 1993)).

279, 283 (Pa.Super. 2013). The Commonwealth sustains this burden by proving one of the following: "1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety." **Commonwealth v. Smith**, 97 A.3d 782, 787 (Pa.Super. 2014) (quoting **Commonwealth v. Hammond**, 953 A.2d 544, 559 (Pa.Super. 2008)).

Antwon claims that "[t]he evidence demonstrated that [he] acted in self-defense and defense of others," because the evidence showed that "after [he] defused the situation and Mr. Palmer began to walk away, Mr. Thompson began to reach for his gun from his hip." Antwon's Br. at 20, 21. This is a mischaracterization of the evidence presented at trial. This portion of "evidence" that Antwon references comes from a Commonwealth witness, Millicent Harvey. On cross examination she testified to the following:

> Q [defense counsel]: Now, you also agree that when you were watching my client speak to Mr. Thompson, Mr. Thompson kept going to his hip; is that correct? Is that what you saw?
>
> A: I don't remember him going to his hip until the guy started shooting.
>
> ***
>
> Q [defense counsel]: . . . Being asked the question: Do you know if anyone else was shooting besides the first guy that you saw shooting?
>
> A: Yes.
>
> Q: Do you remember them asking you that?

A: Yes.

Q: Okay. And do you recall giving the answer: I don't know if the bald guy was shooting, but he kept going to his hip when he was talking to the first guy shooting. Do you recall telling the police that?

A: Something similar. It wasn't quite that. When he started shooting at him he was going – he was going to his hip, I guess to – I assume to get a gun to defend his self.

Q: But you do agree, though, in that statement what you told the police and what you signed was; he kept going to his hip when he was talking to the first guy shooting?

A: No, he wasn't. I believe he probably was counting money when he was talking to the guy, and the guy walked over to him.

Q: So the second person, the second photograph that we looked at, Mr. Thompson, you said he was counting money in his hand; is that correct?

A: I believe he was counting money.

Q: Okay. Then at some point it appeared that he was going to his hip, is that correct?

A: That's after the guy started shooting at him. That's when all three of them seem like they were – two of the three started shooting right back at him. The bald headed one went to this hip. By that time I had dropped down to the floor. So I never actually seen him pull out a gun, but I assume that's what he was going for.

N.T., Trial, May 16, 2017, at 282, 283-84.

Harvey remained immovable in her testimony that Antwon began shooting first, prior to Thompson moving his hand toward hip area. In addition, the Commonwealth presented testimony of another participant in

the shootout, Byron McDonald, that Antwon shot in the direction of Palmer before McDonald and his two other companions returned fire. *Id.* at 117-19, 120-22. Therefore, we agree with the trial court that the Commonwealth refuted Antwon's self-defense claim because it presented evidence that "the shootout was started by [Antwon,] who pulled his weapon and began firing, without provocation, before anyone else produced a weapon." TCO at 9. Thus, the above testimony established that Antwon provoked the use of force, thereby disproving his self-defense claim. *See Smith*, 97 A.3d at 787. The same evidence refutes Antwon's defense of others claim as well. The Commonwealth's evidence rebuts all of Antwon's arguments that he was trying to deescalate the argument. No relief is due.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/4/19</u>